BURKE CONSTRUCTION COMPANY *v.* ST. LOUIS & SAN FRAN-
CISCO RAILROAD COMPANY.

## Opinion delivered June 16, 1919.

1. CARRIERS—INJURY TO SHIPMENT—INHERENT DEFECT—EVIDENCE.—
Where undisputed evidence tended to show that a steam shovel
during shipment received injuries which were due to inherent
defects in the shovel which could not be discovered by ordinary
inspection, a verdict in favor of the carrier will not be set aside
as based only upon conjecture.

2. CARRIERS—LIABILITY—HIDDEN DEFECTS.—An instruction that the
carrier did not insure the safe transportation and delivery of the
steam shovel against damages resulting from the defective con-
dition the same was in when it was delivered to the carrier for
shipment, and the carrier was under no duty to search for
concealed defects in the steam shovel, was not objectionable as
assuming that the steam shovel was in a defective condition
where no specific objection pointed out the language objected to,
and where other instructions properly charged the jury to de-
termine whether there were concealed or hidden defects in the
shovel.

Appeal from Sebastian Circuit Court, Fort Smith
District; *Paul Little,* Judge; affirmed.

### STATEMENT OF FACTS.

This is an action by the appellant against the appel-
lee to recover damages for the alleged destruction of a
certain steam shovel and steam shovel boom.

The appellant alleged that it delivered the shovel
and boom to the appellee for carriage from Fort Smith
to Riverton, according to the contract for shipment, and
that they were worth the sum of $6,000, for which the ap-
pellant asked judgment.

The appellee admitted that it received the shovel
and boom and admitted the contract for shipment and
admitted that they were not delivered according to con-
tract but denied any liability for failure to deliver, and
also denied that the shovel and boom were worth the sum
of $6,000.

Appellee alleged in its answer that the steam shovel
was moved on its own wheels; that the outfit was placed
in one of its trains and moved out of Fort Smith; that,

while being transported, the coupling device on said shovel became detached from the end sill on account of the worn and defective condition it was in and as a result the same was derailed; that the appellee was guilty of no negligence in handling or transporting the shovel outfit; that in delivering the shovel outfit to the appellee upon its own wheels the appellant warranted the same to be in good condition for transportation; that the appellee had no knowledge that the outfit was not in proper condition to be transported; and it denied liability for any loss or damage caused solely by the defective condition of the outfit.

The facts are substantially as follows: On the 3rd of July, 1917, the appellant delivered to the appellee at Fort Smith, Arkansas, one steam shovel moving on its own wheels, and the equipment for same which was loaded on an ordinary flat car. The shovel was inspected by appellee's car inspector and car foreman before it was accepted for shipment and certain defects that were discovered were repaired and the shovel then accepted for shipment. The shovel car was connected up with one of appellee's freight trains consisting of an engine, 26 cars and a caboose. The caboose was the last car in the train and the shovel car was the sixth car ahead of the caboose, the flat car carrying the equipment being immediately behind the shovel car. After the shovel car and its equipment were connected up with the train, it was again inspected by the conductor who discovered no defects.

The train was handled in the usual manner, nothing out of the ordinary happened until it reached the place where the wreck occurred. The train stopped at the regulation crossing of the Iron Mountain railroad and at Chester where a helper engine was put on to push it over the mountain to Winslow, where the helper engine was detached. The train left Winslow and stopped at Brentwood. It left Brentwood, and wreck occurred between West Fork and Wolsey while the train was running at the rate of about 25 miles per hour on a level track.

The only witnesses to the wreck were the conductor, brakeman and engineer. The conductor was in the cupola of the caboose. He was looking ahead and saw dust arising and knew something was wrong. He turned to pull the air to set the air brakes and the air was gone. He went forward immediately and found the car just behind the shovel car had shot over to the right of the track, its contents spilled around. The steam shovel car was across the track, another car was off the track and one set of wheels or trucks of another car were off the track. The track sloughed. The train proper stopped possibly ten car lengths ahead of these wrecked cars. This was because when the air separated it set the brakes and stopped the momentum of the train immediately and brought it to a standstill. He remained at the wreck only long enough to take in the situation and get an idea of the cause of the wreck so he could make an intelligent report. He went back in an hour or so and remained until the main line was clear. He then made an examination of the situation to determine what caused the wreck. He found that the draw bar casting off of the steam shovel car had come down between the rails and had derailed these cars. The casting was three or three and one-half feet long and 12 or 14 inches wide. The ordinary sill is seven feet long and 12 inches wide. The casting was a little wider. It went back under the car, some of it in the shape of an angle. It was attached to the steel end of the sill of the car. This casting was off and mixed up with the flat car immediately behind the wreck. It had mixed up with the brake shoe and the two wheels, having been caught by them and pulled along about ten car lengths in the middle of the track. There was evidence of it having been rolled along the middle of the track. The witness used the end of a table in the courtroom to describe how the drawbar casting had been attached to the end of the sill and what the end sill was. The flat car upon which the boom and shovel were loaded was off the track and the other car had wobbled around in a different position. Witness saw it and it "looked like a ship going over the waves."

The engineer testified that the first thing that called his attention to anything that caused the wreck was when the brakes appeared to go on emergency. I could not see myself, but my fireman looked back and said, "We are in the ditch." The train stopped and witness went back to see really what it was. He found two cars were derailed. The train had parted, and the air hose broken in two. Witness remained about two minutes. He made no examination as to the cause of the wreck. The speed he was making at the time the derailment occurred was between 22 and 25 miles an hour. It was over the best track they had, just a little bit down hill, all new steel and on good ballast. Witness was on the left side and could not see the trouble on account of the curve. The engine had gone around the curve two car lengths. After the emergency brakes went on the train ran about 400 feet.

The head brakeman testified that there was no unusual handling of the train on the trip and no switching. He was going over the train through Wolsey when the brakes went on emergency and looked back to see what was wrong with the rear end of the train and the steam shovel car was turned over. It was off to one side of the bank with one end lying across the track. He demonstrated its situation before the jury.

The assistant superintendent testified that it was his duty, representing the superintendent, to determine as near as he could what caused the wreck. He went to the scene about two and a half hours after it occurred. He found the end sill of the steam shovel had broken out in the center, which permitted the drawbar casting to drop in the center of the track, and that was what they determined caused the wreck. This casting was about 44 inches long, 12 inches wide, 1 inch thick. What the arm or knuckle fits into and the pin goes goes through, detached, would be probably two feet, or two feet and a half through. The witness saw evidences on the ties where the drawbar casting had caught and also where it had struck the trucks of the car. The witness was asked if he examined the cracks of the steam shovel car in front

where the end sill was broken and answered in the af-
firmative.  He was then asked to describe same to the
jury and he demonstrated from the end of the table in
the courtroom as to the construction and he described it
as follows:  "The end sill is a piece of iron.  It extends
across the car about 7 feet.  It is about 12 inches wide
and three-quarters of an inch thick.  The end sill is riv-
eted on what we call a side sill or center sill.  The side
and center sills run back full length of the car.  The end
sill was riveted on to the side walls, and center walls,
which are made of iron.  The center sills are 44 inches
from one to the other.  They were riveted to the car.
From where they were riveted to the inside was 38 inches.
That is where it broke.  That let the drawbar casting and
the whole thing drop in to the center of the track.  In ad-
dition to the broken end sill, there was what they call cen-
ter parts, coming from the center sill back.  I found an old
break in the end of the sill; on one side it was about half
way through, or six inches; the other side not so much—
possibly one-fourth of the way through; the balance was
a new break.  When the bar casting was in place it would
cover these old breaks.  The old breaks were both from
the bottom.  I employed a photographer to take the pho-
tographs of the wreck of the steam shovel.  I was present
when he took them."

The photograph was exhibited.  It showed the end
of the car that broke; it was hoisted up five or six feet.
On the photograph you can see the break in the end sill,
and the rivets where it is riveted on to the center sills.
You can see the side sills also.

The witness then proceeded to describe the appear-
ance of the car in its wrecked condition as shown from
the photograph.  "It is my theory that when the drawbar
casting dropped down, of course the trucks struck it.  I
did not see it drop down, but that is what we determined.
I did not see the casting under the car.  I was told about
it.  I first saw this casting on the side of the track, just
a little back of where the steam shovel was lying.  It in-
dicated it had been knocked and churned around on the

track and chats. It was perfectly all right. It was bolted on to the end sill with four bolts. There were no bolts in it when I saw it. I did not see the bolts. They had been shirred. That is my theory. They probably may have been shirred off after they dropped on the track and these trucks ran over them and turned them over and over. I did not see that they had been turned over and over, but the indications were that they had been turned over and over. I saw that something had been rolling along the track, or had been moving on the chats on the roadbed. I do not know what did that but I have a pretty good idea. That is what we determined from the appearance of everything at the point of derailment. If the shovel car from the train proper was bouncing along the track, first on one side and then on the other, it could not have made these indentations, gashes and scars, with an ordinary outfit. It would not have made that kind. That is my theory or inference. The angle bar, I spoke of, which appears in the photograph, was about six inches wide and three-fourths of an inch thick, and about two and one-half feet on either side. It was bolted on each end on one of these I-beams and gradually came together, and was pitched right up against the end sill. I suppose it was to strengthen the car. Before the draw-bar casting could fall out, the end sill would have to break and the angle bar would have to break, too, as it was bolted to the end sill. The air brakes would go on emergency and the momentum of the train might carry it 400 feet—according to the speed of the train and the condition of the brakes. I don't know how far from where it rested the steam shovel had left the track, but I noticed flange marks in the ties about 359 feet. There were two other cars behind the shovel car off the track, and one pair of trucks derailed. I cannot tell which car made the flange marks. The track was disturbed possibly 300 feet. Whatever distance the cars made was made by reason of momentum the train had before the break occurred. The old breaks in the end sill were so covered by the drawbar casting, I don't think an inspector could have seen it, with a reasonable inspection."

The roadmaster testified that he was repairing the track at the scene of wreck; that one rail was broken out of the track, badly bent up and warped to pieces. Practically torn loose from the ties, but fastened at one end. The disturbance was some three or four hundred feet. It was about the center of the disturbance. Forty-four ties were broken in the center. No curve in the track where the derailment occurred. "The vibration of the train could have caused it to break and by having so much space in there—44 inches of space—and the working and vibration on that end sill would, in my judgment, cause it to break on a pull. I never found that piece that came out of the end sill; I only found the casting and the space between. There were no bolts in the casting. I did not see the casting bolted on to the car at all."

James A. Burke, for the appellant, testified that the shovel was worth when shipped the sum of $4,000.

The verdict and judgment were for the appellee, and this appeal is duly prosecuted.

Other facts stated in the opinion.

*Winchester & Martin,* for appellant.

1. The court erred in giving instruction No. 2 for defendant. It assumes the fact that the shovel outfit was in a defective condition when delivered for transportation. It does more than "assume," as it states in so many words that it was in a *defective condition.* This was error, as announced by this court in many decisions.

2. It was also error to give instruction No. 3 for defendant. It was highly prejudicial and does not state the law correctly, (1) as it is not the law that in delivering the car to be transported on its own wheels, plaintiff warranted it to be in proper condition to be transported to destination on its own wheels. It was open for inspection and was inspected by two of defendant's employees regularly employed for the purpose. (2) It suggests that there were concealed or hidden defects by stating that defendant was under no duty to search for concealed defects. (3) The jury is not confined to the statements

in defendant's answer, "the coupling device on said shovel became detached from the end sill on account of the worn and defective condition it was in and as a result thereof said outfit was derailed  *  *  *  , and that the damage to the same resulting from said derailment was caused and brought about solely by inherent and latent defects existing in said equipment" (the coupling device), but the jury were told, "if you find there were concealed or hidden defects in any part of the steam shovel car described, and if you further find such defects were the sole and proximate cause of the derailment  *  *  *  the railway company would not be responsible therefor." The allegation is confined to the coupling device; the jury is turned into the field of inspection; * * * if you can find any hidden or concealed defects anywhere about the car, it may hinge a verdict on it.

3. It was error to give instruction No. 5 for defendant. There is not a word of testimony in the record to show on which end of the car that end sill that broke was located. It assumes facts not proved by any evidence whatever. The instruction also discusses the weight of the evidence and places undue emphasis on defendant's theory of the wreck, to which it calls attention of the jury. There is no evidence of any defect in the "iron end sill on the steam shovel" except as to two small cracks—one on the bottom. The jury were allowed to enter the field of speculation and conjecture. The instruction given on the court's own motion was also error. The plaintiff's instructions refused state the law correctly, and it was error to refuse them, and the verdict is contrary to and not supported by the evidence. 109 Ark. 206; 181 Fed. 91; C. C. A. 151. Conjecture is an unsound and unjust foundation for a verdict. Juries may not legally guess the money or property of one litigant to another. See 76 Ark. 136; 98 Tex. 451; 139 N. C. 273; 56 Ill. App. 578; 190 Fed. 689; 45 U. S. (L. ed.) 361; 179 U. S. 658; 79 Ark. 437; 73 Tex. 304; 47 Minn. 384; 131 N. Y. 671.

*W. F. Evans* and *Warner, Hardin & Warner,* for appellee.

1. The verdict is supported by the evidence, and no errors were made by the court in giving and refusing instructions. On the whole case the verdict is right and the judgment should be affirmed. 130 Ark. 34; *Id.* 593; *Ib.,* 377. See also 134 Ark. 300. The testimony shows that defendant used due care and diligence in the inspection and transportation and defendant was not liable if the derailment and damage was caused by a defect in the end sill on the front end of the car which could not be discovered by an ordinary inspection. 118 Ark. 400; 117 *Id.* 45; *Id.* 269; *Ib.* 363; Hutch. on Carriers (3 ed.), § 334; 249 Fed. 308; 108 S. W. 150; 53 So. 832; Elliott on Railroads (2 ed.), § 1854.

There are exceptions to the rule as to the liability of railways as insurers of goods transported. 118 Ark. 400. See also 117 Ark. 451; 100 *Id.* 269; 99 *Id.* 363. The cases cited by appellant as to conjecture and speculation in the verdict of the jury are not in point. 107, 476; *Id.* 61.

2. The instructions given fairly presented the issues and correctly stated the law. 87 Ark. 281; 69 *Id.* 172; 87 *Id.* 531.

3. There was no error in refusing plaintiff's instructions. This court will not explore the record to find errors not stated nor pointed out in appellant's abstract and brief. Exceptions saved but not argued are treated as abandoned. 133 Ark. 250; *Id.* 372; 129 *Id.* 253.

4. No error in permitting the introduction of photographs in evidence. 85 Ark. 528; 111 *Id.* 83.

WOOD, J., (after stating the facts). One of the grounds of motion for new trial is that the verdict "is contrary to and not supported by the evidence."

Counsel for appellant, in both their brief and oral argument, strongly urge that the judgment be reversed, because there was no evidence to sustain the verdict, and because same was based only upon conjecture.

But, after a careful consideration of the facts which the testimony tended to prove, as above set forth, we have reached the conclusion that there was evidence to sustain the verdict. There was testimony that at the time the wreck occurred the train was making 20 to 25 miles an hour over the best track the company had, "just a little bit down grade, all new steel and on good ballast." The train was being operated in the ordinary manner. It was not proved by the appellant that there were any defects in the track or train. There was no evidence of negligence in the manner of the operation of the train. The appellee on the other hand proved by the undisputed evidence that there were two old breaks in the end sill, one from 4 to 6 inches long, and the other from 2 to 3 inches; that these cracks could not be discovered by the ordinary inspection which was made before the shovel car was received for shipment.

The appellee introduced evidence tending to prove that after the wreck occurred it was discovered that the end sill on the front end of the shovel car had pulled out; that a piece in the middle of the sill 38 inches long to which the coupler casting was attached had broken out on both sides and that the coupler casting had dropped down into the center of the track; that the two breaks in the sill, which caused the coupler casting to drop down, were on the line of the old cracks.

The conductor, who made an investigation of the cause of the wreck, said that he found that the drawbar casting of the steam shovel had come down between the rails and derailed the car. The assistant superintendent, who visited the scene of the wreck about two and a half hours after it occurred for the purpose of ascertaining its cause, says he "found the end sill of the steam shovel had broken out in the center, which permitted the drawbar casting to drop in the center of the track and that was what we determined caused the wreck."

Now these facts were sufficient to warrant the jury in finding that the cause of the wreck was old breaks in the end sill. The condition of the shovel car before and

just after the wreck was fully described by the witnesses and the condition of the track and the train are also fully described. Photographs were duly identified and exhibited showing the condition of the shovel car and witnesses demonstrated before the jury where the break was and without objection stated their conclusion as to how the wreck occurred.

Without discussing the evidence further, it suffices to say that the testimony was sufficient to justify the jury in finding that the proximate cause of the wreck was the undiscoverable defect in the shovel car. The proof being sufficient to warrant the jury in so finding, it cannot be said that its verdict was grounded merely upon conjecture.

Learned counsel for appellant cite among others the case of *Patten* v. *Texas Pacific R. R. Co.*, 179 U. S. 658. Syllabus 2 of the case is as follows: "Where the testimony leaves the matter uncertain and shows that any one of a half dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause when there is no satisfactory foundation in the testimony for that conclusion."

We fully approve of that doctrine, but it is not applicable to the facts of this record. Here the appellee adduced evidence which, as we have seen, warranted the jury in concluding that the wreck was caused by the old breaks or defects in the end sill which could not be, and were not discoverable by the thorough inspection which was made by the appellee. If the appellant had shown that the appellee was negligent in the handling of the train or in failing to make a reasonable inspection or had shown that the track, rails, ties, or any of the train appliances were defective and as well calculated to have caused the injury, as the defective condition of the end sill, then there would be some reason for the application of the doctrine invoked by appellant's counsel. But in

none of the cases from our own court or other jurisdictions cited by appellant are the facts the same or similar to those we now have under review.

The court in substance instructed the jury that the appellee did not insure the safe transportation and delivery of the "steam shovel outfit" against damages resulting "from the defective condition the same was in when it was delivered to the appellee for shipment." That the appellee "was under no duty to search for concealed defects in the steam shovel."

It is contended that the instructions in this form assumed that the shovel car was in a defective condition. There was no specific objection raising the point here insisted upon by counsel for appellant, and, even if there had been, the instructions, when taken together, are not susceptible of that construction because in other instructions the court clearly left the issue for the jury to determine whether "there were concealed or hidden defects" in any part of the steam shovel car, described in this case, and, if so, whether or not such defects "were the sole and proximate cause of the derailment and damage resulting therefrom."

When the instructions to the jury are considered as a whole, we find no conflict or inconsistency in the charge. It was the duty of the appellant, if it conceived that this language of the charge was incorrect, to call the attention of the court specifically to the proposition which he now urges for reversal. Moreover, even if the instructions assumed that the steam shovel outfit was in a defective condition and that the defects were concealed, these facts were established by the uncontroverted evidence. The instruction, therefore, in the form given could not have been prejudicial to appellant, and the giving of it was not reversible error. *Pacific Mut. Ins. Co.* v. *Walker,* 67 Ark. 147-154; *St. L., I. M. & S. Ry. Co.* v. *Burrow,* 89 Ark. 178.

It is also manifest that the court, when the instructions are considered as a whole, did not intend to tell the jury that the damages to the steam shovel outfit resulted from the defective condition the same was in when it was

delivered to the appellee for shipment. An instruction in this form would have been on the weight of the evidence and inherently defective. The instructions, when read together, declared the law to be that the appellee would not be liable for damages resulting from the steam shovel outfit caused by its defective condition, and submitted to the jury to determine the issue as to whether or not the damages were caused by the defective condition or whether same resulted from some other cause. The court plainly told the jury in other instructions that the appellee would be liable unless the jury found that the damage was caused solely from a defective condition of the steam shovel outfit. The charge, as a whole, left the jury to determine whether or not there was a defective condition of the steam shovel outfit, and, if so, whether or not this condition was the sole cause of the damage.

Counsel criticise other instructions which we have considered and find that the charge as a whole furnished the jury a correct guide for their deliberations.

The record shows no reversible error, and the judgment is affirmed.